# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| VALLEY NATIONAL BANK, a Nationally Associated Bank, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 15-CV-0282-CVE-TLW ) |
| CORONA-NORCO UNIFIED SCHOOL DISTRICT, a Riverside County, California School District, | ) ) ) ) |
| Defendant. | ) ) |

## OPINION AND ORDER

Before the Court are defendant's motion to dismiss for lack of personal jurisdiction and brief in support (Dkt. # 10), and its motion to dismiss for improper venue and brief in support (Dkt. # 11). Plaintiff, which acquired the rights to the accounts receivable of KPI Architecture, Inc. (KPI), filed a complaint alleging that defendant breached its contracts with KPI by failing to pay for services rendered. Dkt. # 2, at 1. Defendant seeks to dismiss the complaint for two reasons: pursuant to Fed. R. Civ. P. 12(b)(2), that this Court lacks personal jurisdiction over it, Dkt. # 10, at 1; and pursuant to Fed. R. Civ. P. 12(b)(3), that venue is not proper in the Northern District of Oklahoma. Dkt. # 11, at 1. Plaintiff responds that defendant's contacts with the state of Oklahoma are sufficient for this Court to exercise personal jurisdiction, Dkt. # 16, at 5, and that venue is proper in this district. Dkt. # 17, at 1. In each response, plaintiff requests that, should the Court grant one or both of defendant's motions to dismiss, the matter be transferred instead of dismissed. Dkt. # 16, at 21; Dkt. # 17 at 10. Defendant has filed a reply to each of defendant's responses. Dkt. ## 18, 19.

**I.**

This case revolves around the business relationship between defendant, a public school district in Riverside County, California, and KPI, an architecture firm. KPI had its headquarters in Tulsa, Oklahoma, but it also operated a satellite office in Corona, California and was registered as a California corporation. Dkt. # 10-1, at 1. According to Ted Rozzi, defendant's assistant superintendent of facilities, defendant began to employ KPI to provide design drawings for construction projects as early as 1992, and the relationship continued until KPI ceased operations in 2014. Dkt. # 10-1, at 1, 4. David Kindred, Sr., was KPI's head executive, and he was also a licensed California architect and KPI's registered agent for service of process in California. Id. at 3. Kindred frequently traveled from Oklahoma to California to meet with his clients there, including defendant. Id.

According to Rozzi, defendant had no contact with KPI's office in Oklahoma; all communications were through KPI's California office or in-person meetings at Rozzi's own office. Id. at 1, 3. At no point did defendant send employees or agents to Oklahoma for business purposes. Id. at 2. While Rozzi did communicate with various KPI employees by e-mail, Rozzi states that such communications were either to Kindred at his personal e-mail address or to employees who, Rozzi believed, worked at KPI's California office. Id. at 5. Negotiations for the provision of architectural services occurred almost entirely in California, and the contracts were agreed to in California by either Kindred or Danny Hensiek, another KPI executive. Id. at 4-5. While on some occasions Rozzi requested that KPI provide certain services, on other occasions Kindred offered Rozzi unsolicited proposals. Id. at 4. Rozzi believed that all work was to be performed by KPI's California office. Id.

at 6. Invoices were sent from KPI's California office, and payments were made to KPI at either its California office or at Rozzi's office. Id. at 6-7.

However, the affidavits of two former KPI employees present a different picture of KPI's relationship with defendant. Hensiek, who worked at KPI's Oklahoma office and was a vice-president of KPI when it ceased operations, Dkt. # 16-2, at 1, engaged in regular telephone and e-mail communications with Rozzi and Lynne Murray, Rozzi's assistant, for seven years. Id. at 2-3. Hensiek estimates that, over the course of his employment, he "exchanged hundreds of e-mails and telephone calls with Ms. Murray." Id. at 3. He recounts that defendant regularly communicated with Kindred while Kindred was in Oklahoma, including negotiating prospective contracts. Id. Further, employees of the Oklahoma office, including Hensiek, "worked on approximately 90% of the projects for [defendant]." Id. at 2. Mark Gelsinger, like Hensiek, was a vice-president of KPI and worked at KPI's office in Oklahoma. Id. at 5. He stated that he and other employees of the Oklahoma office completed "a significant amount" of the work needed for defendant's projects. Id. at 6. Gelsinger estimates that he communicated with Murray and Rozzi "a couple of times of [sic] week when a project was in the programming phase," with more than one hundred e-mails and telephone calls exchanged during his employment. Id.

At some point, KPI borrowed money from Bank of the Lakes, N.A., and as collateral gave Bank of the Lakes a security interest in its accounts receivable. Dkt. # 16-1, at 2. Bank of the Lakes later merged with plaintiff, leaving plaintiff the holder of the security interest. Id. On August 13, 2014, Kindred passed away unexpectedly, and KPI soon defaulted on its loans; to resolve the default, KPI assigned all rights to its accounts receivable to plaintiff. Id. In its review of KPI's

accounts receivable, plaintiff found what it believed to be unpaid invoices showing that defendant owed KPI $1,859,099.08 for services rendered. Id.

In September 2014, Hensiek, Gelsinger, and Thomas Biolchini, who is both plaintiff's vice-chairman and an attorney with the law firm representing plaintiff in this case, id. at 1, met with Rozzi in California regarding the invoices. Id. at 2. According to Biolchini, the meeting did not resolve the issue, and thereafter Rozzi and Biolchini exchanged e-mails and telephone calls from late September to late October 2014, including six e-mails from Rozzi to Biolchini. Id. at 3, see also id. at 5-13. Some of the e-mails sent by Biolchini contain a signature block displaying an address in Tulsa, Oklahoma. E.g. id. at 6. In November 2014, defendant began to conduct its communications through counsel, and Biolchini states that he exchanged numerous letters, e-mails, and telephone calls with defendant's counsel prior to defendant's final assertion that it would not pay the invoices. Id. at 3-4. One letter shows that it was addressed to Biolchini in Oklahoma. Id. at 14.

Plaintiff presented defendant with a notice of claim, which defendant rejected. Dkt. # 2, at 3. Plaintiff thereafter filed its complaint against defendant, asserting claims for breach of contract, account stated, equitable estoppel, and quantum meruit. Dkt. # 2, at 13-17. Defendant moves to dismiss the complaint for lack of personal jurisdiction and improper venue. Dkt. ## 10, 11.

**II.**

Defendant argues that plaintiff's claims should be dismissed because this Court lacks personal jurisdiction. Dkt. # 10, at 4. Plaintiff responds that the Court may exercise personal jurisdiction over defendant based on defendant's voluntary and intentional contacts with Oklahoma. Dkt. # 16, at 5. When defendant moves to dismiss for lack of personal jurisdiction under Rule

4

12(b)(2), plaintiff bears the burden of establishing that the Court has personal jurisdiction over defendant. OMI Holdings, Inc. v. Royal Ins. Co. of Canada, 149 F.3d 1086, 1091 (10th Cir. 1998). "When a district court rules on a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, . . . the plaintiff need only make a prima facie showing of personal jurisdiction to defeat the motion." Id. (citations omitted). "The plaintiff may make this prima facie showing by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant." Id. at 1091. "In order to defeat a plaintiff's prima facie showing of jurisdiction, a defendant must present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)). The allegations of the complaint must be accepted as true to the extent they are uncontroverted by a defendant's affidavit. Taylor v. Phelan, 912 F.2d 429, 431 (10th Cir. 1990). If the parties provide conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor. Id.

For a court to exercise personal jurisdiction over a nonresident defendant in a diversity action, the plaintiff must demonstrate the existence of every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of the United States Constitution. See OKLA. STAT. tit. 12, § 2004(F). "Because Oklahoma's long-arm statute permits the exercise of jurisdiction that is consistent with the United States Constitution, the personal jurisdiction inquiry under Oklahoma law collapses into the single due process inquiry." Intercon, Inc. v. Bell Atl. Internet Solutions, Inc., 205 F.3d 1244, 1247 (10th Cir. 2000) (citing Rambo v. Am. S. Ins. Co., 839 F.2d 1415, 1416 (10th Cir. 1988)); see also Hough v. Leonard, 867 P.2d 438, 442 (Okla. 1993).

"Due process requires that the nonresident defendant's conduct and connection with the forum state are such that the nonresident could reasonably anticipate being haled into court in that state." Conoco, Inc. v. Agrico Chem. Co., 115 P.3d 829, 835 (Okla. 2004) (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). "The Due Process Clause permits the exercise of personal jurisdiction over a nonresident defendant 'so long as there exist minimum contacts between the defendant and the forum State.'" Intercon, 205 F.3d at 1247 (quoting World-Wide Volkswagen, 444 U.S. at 291). The existence of such minimum contacts must be shown to support the exercise of either general jurisdiction or specific jurisdiction. Id. "When a plaintiff's cause of action does not arise directly from a defendant's forum related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's business contacts with the forum state." Id. (citing Helicopteros Nacionales de Colombia v. Hall, 466 U.S. 408, 414-16 & n.9 (1984)). Alternately, a court "may, consistent with due process, assert specific jurisdiction over a nonresident defendant 'if the defendant has purposefully directed his activities at the residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities.'" Id. (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). Plaintiff argues that defendant's contacts with Oklahoma support specific personal jurisdiction. Dkt. # 16, at 11.

Specific jurisdiction requires a two-step analysis. First, courts "must consider whether 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" Benton v. Cameco Corp., 375 F.3d 1070, 1075 (10th Cir. 2004) (quoting World-Wide Volkswagen, 444 U.S. at 297). To do so, courts "determine whether the defendant has sufficient minimum contacts with the forum." Zenergy, Inc. v. Coleman, No. 09-CV-

0381-CVE-FHM, 2009 WL 3571314, at *5 (N.D. Okla. Oct. 26, 2009) (citing OMI Holdings, 149 F.3d at 1091). If such minimum contacts exist, then courts must "consider whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'" Benton, 375 F.3d at 1075 (quoting OMI Holdings, 149 F.3d at 1091).

For a court to exercise specific jurisdiction over a defendant, that defendant must have such minimum contacts with the forum state that the defendant has "'purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." Burger King, 471 U.S. at 475 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). "Within this inquiry we must determine whether the defendant purposefully directed its activities at residents of the forum, and whether the plaintiff's claim arises out of or results from 'actions by the defendant himself that create a substantial connection with the forum state.'" OMI Holdings, 149 F.3d at 1091 (citing Burger King, 471 U.S. at 472; Asahi Metal Indus. Co. v. Sup. Ct. of Cal., 480 U.S. 102, 109 (1987)). Contacts exist "where the defendant 'deliberately' has engaged in significant activities within a State, or has created 'continuing obligations' between himself and residents of the forum.'" Id. at 475-76 (citations omitted).

Plaintiff argues, based on the affidavits of Biolchini, Hensiek, and Gelsinger, that defendant had sufficient contacts with Oklahoma such that it could have foreseen being haled into an Oklahoma court. Dkt. # 16, at 8. First, plaintiff emphasizes the long business relationship and numerous contracts between defendant and KPI in Oklahoma. Id. at 12. Although contracts on their own do not serve as contacts, any "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" are relevant factors to determine if defendant reached out to Oklahoma. Burger King, 471 U.S. at 478. According to

7

Hensiek and Gelsinger, defendant did conduct some, albeit not many, contract negotiations by telephone with Kindred while Kindred was in Oklahoma. Id. at 3, 7.

However, the contracts provide minimal contacts with Oklahoma for purposes of personal jurisdiction. First, the contracts themselves are not before the Court, and so it is not possible to determine if their terms or contemplated future consequences show that defendant intentionally directed activities at Oklahoma. While Hensiek and Gelsinger both state that defendant conducted negotiations with Kindred while Kindred was in Oklahoma, id. at 3, 7, there is no fact showing that defendant knew that Kindred was in Oklahoma at the time. See OMI Holdings, 149 F.3d at 1091 (requiring defendant to have "purposefully" reached out to the forum state). Plaintiff does not contradict Rozzi's statements that defendant conducted most negotiations in California or that the contracts were agreed to in California. Dkt. # 10-1, at 4-5. Plaintiff also does not contradict Rozzi's statements that KPI's invoices were sent from its California office with a California address or that payment was made either to KPI's California office or in Rozzi's office. Id. at 6-7. Rozzi's statement is partially confirmed by the copies of the invoices attached to the complaint, all showing that they were mailed from KPI's office in Corona, California. See Dkt. # 2-1, at 1-16.

In addition to the contracts, plaintiff asserts that defendant's communications with KPI and plaintiff serve as contacts with Oklahoma. Dkt. # 16, at 13. Letters, telephone calls, and e-mails can, but do not necessarily, establish minimum contacts with a forum state. See Shrader v. Biddinger, 633 F.3d 1235, 1247 (10th Cir. 2011); Far W. Capital, Inc. v. Towne, 46 F.3d 1071, 1077 (10th Cir. 1995). Whether such communications serve as a contact depends on the nature of the act. See Shrader, 633 F.3d at 1247-48. Hensiek and Gelsinger both state that they regularly exchanged telephone calls and e-mails with Rozzi and Murray regarding defendant's projects, with the total

amount of these communications numbering in the hundreds. Id. at 2-3, 6. Both men also state that, at the time, Rozzi and Murray knew that the KPI personnel with whom they were communicating were located in Oklahoma. Dkt. # 16-2, at 3,6. According to Biolchini, he and Rozzi exchanged several e-mails and telephone calls regarding the invoices. Dkt. # 16-1, at 3. Biolchini's signature block, included in some of the e-mails, clearly shows that he is located in Oklahoma. See id. at 6. Defendant's counsel also spoke with Biolchini by telephone, id. at 3, and counsel's letter to Biolchini discussing the invoices was addressed to Biolchini in Oklahoma. Id. at 14.

Again, many of these interactions have minimal weight as contacts for purposes of personal jurisdiction. While Hensiek and Gelsinger both state that Rozzi and Murray knew that they were directing their communication to Oklahoma, they give no indication of how Rozzi and Murray would have had this knowledge. See OMI Holdings, 149 F.3d at 1091. Plaintiff presents no alternate evidence of Rozzi's and Murray's knowledge. While plaintiff's burden at this stage is "light," see Wenz v. Memery Crystal, 55 F.3d 1503, 1505 (10th Cir. 1995), it remains plaintiff's burden to show that defendant "purposefully directed its activities at residents of" Oklahoma. OMI Holdings, 149 F.3d at 1091. Simply averring to the knowledge of another party, without more, is not enough. Moreover, the Tenth Circuit has said that sending an e-mail will not serve as a contact unless the e-mail address or the body of the text show that the sender knew that the recipient was located in the forum state. Shrader v. Biddinger, 633 F.3d 1235, 1247-48 (10th Cir. 2011). Thus, defendant's e-mails to Biolchini do evidence reaching out to Oklahoma because his signature block, which would have been visible following his first communication, clearly demonstrates his presence in Oklahoma. However, there is no evidence that defendant knew, based on the recipients' e-mail addresses, that its e-mails to Hensiek, Gelsinger, or other KPI employees were being received in Oklahoma, see

9

Dkt. # 16-2, at 13 (showing Hensiek's e-mail address as "dhensiek@kpiarchitects.com"), and Rozzi stated without dispute that his e-mails to Kindred were to a personal e-mail address. Dkt. # 10-1, at 5. Of the few e-mails from Murray to Hensiek or Gelsinger provided by the parties, the body of the text does not show that Murray knew that the recipient was in Oklahoma. See Dkt. # 16-2, at 8, 13. Thus, defendant's communications with Biolchini only could serve as contacts with Oklahoma for purposes of the personal jurisdiction analysis.

Defendant, citing Coyazo-Hernandez v. Davis & Feder, No. CIV 04-1207 JB/WDS, CIV 04-1208 JB/WDS, 2005 WL 2296403 (D.N.M. Aug. 17, 2005), and Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990), argues that the Court should reject communications to a party's attorney as a form of reaching out to a forum state. Dkt. # 18, at 8 n.4. However, these cases are inapposite, for two reasons. First, each case concerned an out-of-state lawyer's communications about out-of-state legal representation to the lawyer's own client in the forum state, and the deciding courts determined that these communications were not contacts with the forum state. Sher, 911 F.2d at 1362-63; Coyazo-Hernandez, 2005 WL 2296403, at *14. Here, Biolchini did not represent defendant, nor was there pre-existing litigation that would have required communication between Biolchini and defendant. Second, defendant ignores that Biolchini is not only an attorney with the firm representing plaintiff, but also one of plaintiff's vice-chairmen. Dkt. # 16-1, at 1. Defendant's cases are silent as to whether a party reaching out to another party's representative prior to the institution of litigation should be ignored as part of the contacts analysis. Coyazo-Hernandez and Sher do not prevent the Court from considering defendant's communications with Biolchini as contacts.

Resolving all factual disputes in plaintiff's favor, see Taylor v. Phelan, 912 F.2d 429, 431 (10th Cir. 1990), plaintiff has alleged sufficient facts to show that defendant had at least some

10

contacts with Oklahoma. However, the question to be resolved in the first part of the minimum contacts analysis is not whether contacts exist, but whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World Wide Volkswagen, 444 U.S. at 297. Although defendant did perform some acts of reaching out to Oklahoma by communicating with Biolchini and performing some amount of negotiations with Kindred, it is clear from the totality of defendant's relationship with KPI that it would not have anticipated being haled into an Oklahoma court. Defendant employed an architecture firm that was registered as a California corporation to provide design drawings for construction projects in California. Dkt. # 10-1, at 3. The majority of the contracts between defendant and KPI were negotiated in California, and all were agreed to in California. Id. at 4-5. Invoices were mailed from KPI's California office, e.g., Dkt. # 2-1, at 1, and they were paid in California. Dkt. # 10-1, at 6-7. Prior to the meeting in September 2014 regarding the KPI invoices, defendant had no contact or relationship with plaintiff. Id. at 7. Defendant could not, based on its few contacts with Biolchini and possible negotiations with KPI's Kindred while Kindred was in Oklahoma, reasonably anticipate that it would be haled into an Oklahoma court to answer for its alleged breach of contract.

Plaintiff argues that defendant's contacts are sufficient, citing the Tenth Circuit's decision in Pro Axess, Inc. v. Orlux Distribution, Inc., 438 F.3d 1270 (10th Cir. 2005), this Court's prior decision in Gray Media, LLC v. LoveWorld Ltd., No. 14-CV-399-CVE-TLW, 2014 WL 6836342 (N.D. Okla. Dec. 3, 2014), and the Oklahoma Supreme Court's decision in Mastercraft Floor Covering, Inc. v. Charlotte Flooring, Inc., 313 P.3d 911 (Okla. 2013). Dkt. # 16, at 13-16. In Pro Axess, the Tenth Circuit upheld the district court's exercise of personal jurisdiction where the defendant solicited a contract with a company in the forum state, where the contract required the

11

plaintiff to provide services continually in the forum state, and where the defendant exchanged numerous direct communications with the plaintiff over the course of the business relationship. Pro Axess, 428 F.3d at 1277-78. The Tenth Circuit noted that Pro Axess was "a somewhat close case." Id. at 1279. This Court found that it could exercise personal jurisdiction over two defendants in Gray Media because those defendants directed at least 30 e-mails and 9 telephone conversations to the Oklahoma plaintiff as part of negotiating a contract and because the contract contemplated an extended business relationship between the parties. Gray Media, 2014 WL 6836342, at *4-*5. The Oklahoma Supreme Court determined in Mastercraft that the exercise of personal jurisdiction was proper where an out-of-state corporation solicited a contract with an Oklahoma corporation, made "[a]t least 30-40 phone calls and 140 emails" regarding the contracted work, and mailed some contractual payments to Oklahoma. Mastercraft, 313 P.3d at 916-17.

However, plaintiff's citations to these cases are, for the most part, unavailing. Unlike all three cases, plaintiff provides no facts showing that defendant sought out KPI to provide the services that are designated in the unpaid invoices. Rather, Rozzi stated, and plaintiff did not dispute, that he occasionally contacted KPI to provide services but also that Kindred would approach defendant with proposals for services. Dkt. # 1--1, at 4. Moreover, unlike the cited cases, there is no evidence that a large number of defendant's communications dealt with the contracts or invoices that are the subject of plaintiff's complaint, although the exchanges with Biolchini undoubtedly did. Likewise, there is no evidence to show that any negotiations between defendant and Kindred while Kindred was in Oklahoma involved the projects or invoices at issue here. Unlike Gray Media, the contracts between KPI and defendant are not before the Court, so the Court cannot determine whether the contracts contemplated an extended relationship. And unlike Mastercraft, there is no evidence that

defendant directed any payments to Oklahoma; the invoices bear a California address, e.g. Dkt. # 2-1, at 1, and Rozzi's uncontested statement was that all payments were made in California. Dkt. # 10-1, at 6-7. Defendant's contacts with Oklahoma are much less than those described in Pro Axess, which the Tenth Circuit described as "somewhat close," or in Gray Media or Mastercraft.

"The touchstone of a minimum contacts analysis is whether 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" Benton v. Cameco Corp., 375 F.3d 1070, 1078 (10th Cir. 2004) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). The Court finds that defendant could not reasonably anticipate that it would be haled into an Oklahoma court based on its few contacts with Oklahoma. Accordingly, the Court finds that plaintiff has failed to make a prima facie showing that defendant had sufficient minimum contacts with Oklahoma to support the exercise of personal jurisdiction.[1]

### III.

As the Court finds that it lacks personal jurisdiction over defendant, the Court must consider plaintiff's request that the action be transferred rather than dismissed. Dkt. # 16, at 21. Defendant does not respond to plaintiff's request. "[W]here the court determines that it lacks jurisdiction and the interests of justice require transfer rather than dismissal, '[t]he correct course . . . [is] to transfer the action pursuant to [28 U.S.C. § 1631].'" Trujillo v. Williams, 465 F.3d 1210, 1223 (10th Cir. 2006) (quoting Ross v. Colo. Outward Bound Sch., Inc., 822 F.2d 1524, 1527 (10th Cir. 1987)). Section 1631 states that "[w]henever a civil action is filed . . . and th[e] court finds that there is a

---

[1] As the Court finds that it lacks personal jurisdiction, the Court need not consider whether venue is proper in this district. Defendant's motion to dismiss for improper venue (Dkt. # 11) is therefore moot.

want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court in which the action . . . could have been brought at the time it was filed or noticed." Before a transfer under § 1631 may take place, the Court "must ascertain that the proposed transferee court is one in which the action 'could have been brought at the time it was filed.'" Viernow v. Euripides Dev. Corp., 157 F.3d 785, 793 n.16 (10th Cir. 2012) (quoting 17 MOORE'S FEDERAL PRACTICE § 111.53 (Matthew Bender 3d ed.)). If so, the transferor court has the discretion to transfer the action if it is "in the interest of justice," although a transfer is not required. Trujillo, 365 F.3d at 1222 ("Although . . . § 1631 contain[s] the word 'shall,' we have interpreted the phrase 'if it is in the interest of justice' to grant the district court discretion in making a decision to transfer an action or instead to dismiss the action without prejudice"). "Factors considered in deciding whether a transfer is in the interest of justice include whether the claims would be time barred if filed anew in the proper forum, whether the claims alleged are likely to have merit, and whether the claims were filed in good faith or if, on the other hand, it was clear at the time of filing that the court lacked the requisite jurisdiction." In re Cline, 531 F.3d 1249, 1451 (10th Cir. 2008).

Although plaintiff is not specific, presumably plaintiff is requesting the case be transferred to the Central District of California, where defendant resides. See Dkt. # 10, at 4 (noting that defendant is based in Riverside County, California). The Court must therefore determine if this action could have been brought in that court at the time it was filed before deciding if a transfer is in the interest of justice. Viernow, 157 F.3d at 793 n.16. Defendant admits that it is a municipal school district based in Riverside County, California, Dkt. # 10, at 5, making it subject to personal jurisdiction in the Central District of California, which contains Riverside County. See Viernow, 157 F.3d at 793 n.16 (stating that a district court would have personal jurisdiction over any corporation

that had its principal place of business in that district). Under 28 U.S.C. § 1391(b), venue would be proper in the Central District of California, as that is the district in which defendant resides. See 28 U.S.C. § 1391(b)(1); see also id. § 1391(c)(2) ("... [A]n entity with the capacity to sue and be sued in its common name . . . shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction . . . ."). Thus, plaintiff could have brought this action in the Central District of California.

The Court has reviewed plaintiff's claims to determine if a transfer is "in the interest of justice." Trujillo, 465 F.3d at 1223. The first factor to consider is whether plaintiff's claims would be time barred if filed now. In re Cline, 531 F.3d at 1451. Plaintiff asserts, without citation, that the statute of limitations would bar a new filing in California because "[plaintiff's] action against [defendant] must be commenced within six months after [defendant] denied [plaintiff's] Notice of Claim." Dkt. # 16, at 21. This statement appears to conflate two related sections of the California Government Code. Under § 911.2, claims against public entities for causes of action not related to personal injury, death, personal property, or growing crops, must be filed within one year of the accrual of the cause of action. CAL. GOV'T CODE § 911.2(a). However, § 915 requires a plaintiff who intends to sue a public entity to provide the entity with notice. Id. § 915(a). Section 911.2 provides the statute of limitations for this action, and it gives a prospective plaintiff one year from the accrual of the cause of action, not six months following the presentation or rejection of the notice of claim. Assuming, as plaintiff does elsewhere in its reply, see Dkt. # 16, at 7, 13, that plaintiff's claims did not arise until after defendant refused to pay the invoices in November 2014, plaintiff's claims would not yet be barred by § 911.2.

15

The second factor is whether plaintiff's claims are likely meritorious. In re Cline, 531 F.3d at 1451. The Tenth Circuit has authorized district courts to "consider the consequences of a transfer by taking 'a peek at the merits' to avoid raising false hopes and wasting judicial resources that would result from transferring a case which is clearly doomed." Haugh v. Booker, 210 F.3d 1147, 1150 (10th Cir. 2000). Some district courts look to whether there is a "colorable argument" that the plaintiff's claims have merit. See Sage v. Bird City Dairy, LLC, Civil Action No. 12-cv-02985-RBJ, 2013 WL 1444370, at *4 (D. Colo. April 8, 2013). The Court has reviewed the complaint and its attachments, Dkt. # 2, as well as the materials included with defendant's motions that point toward its likely defenses. Based on this "peek" at the merits, the Court finds that plaintiff's case is not so "clearly doomed" that transfer would be useless. See Haugh, 210 F.3d at 1150.

The third factor is whether plaintiff filed its claims in this Court in good faith. Id. Although the Court has found that it lacks personal jurisdiction over defendant, that result was not so obvious that plaintiff's filing in Oklahoma was not in good faith. Based on the factors outlined in Cline, the Court finds that it is in the interests of justice to transfer this case to the Central District of California instead of dismissing the complaint for lack of personal jurisdiction.

**IT IS THEREFORE ORDERED** that defendant's motion to dismiss for lack of personal jurisdiction and brief in support (Dkt. # 10) is **granted** to the extent that the Court lacks personal jurisdiction over defendant but **denied** as to dismissal of plaintiff's claims against defendant on that basis.

**IT IS FURTHER ORDERED** that defendant's motion to dismiss for improper venue and brief in support (Dkt. # 11) is **moot**.

**IT IS FURTHER ORDERED** that the Court Clerk is directed to **transfer** this case to the United States District Court for the Central District of California.

**DATED** this 24th day of August, 2015.

*[signature]*
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE